JEFFERSON H. FOXWORTHY v. CITY OF HASTINGS.

[FILED MAY 6, 1891.]

1. **The evidence** examined and considered, and found not to sustain the verdict.
2. **The judgment** reversed and cause remanded for new trial.
3. **Stare Decisis.** The former opinion, 25 Neb., 133, adhered to.

ERROR to the district court for Adams county.   Tried below before GASLIN, J.

*J. R. Webster*, for plaintiff in error:

The city's liability is now *res adjudicata*. (*Foxworthy v.*

*Hastings*, 25 Neb., 133; *Weare v. Fitchburg*, 110 Mass., 334; *Joliet v. Verley*, 35 Ill., 64.) The biased remarks of the juror, vitiate the verdict. (Thornton, Juries, sec. 438; *Harrison v. Price*, 22 Ind., 165.)

*C. J. Dilworth, contra.*

COBB, CH. J.

This action was last heard at the July term, 1888, when the judgment of the district court was reversed, on error, and the cause remanded. (25 Neb., 133.)

The cause remanded was tried again to a jury, with verdict for the defendant. There was a motion for a new trial, which was overruled, and a bill of exceptions taken based upon the refusal of a new trial for lack of evidence to sustain the verdict. There is no complaint of any ruling of the court pending the trial. The fundamental ground of error is whether there was sufficient evidence to sustain a verdict against the plaintiff and for the defendant.

The answer of the defendant was a general denial of the action.

The complaint of the plaintiff, in brief, is that on the 21st day of January, 1886, he went, a stranger, to the Lepin hotel in Hastings, from where he started to visit a drug store in the city; that he had not been in Hastings since 1883 previously, and arrived there after dark; that immediately after leaving the hotel on the sidewalk, near its southeast corner, he slipped on ice and fell, breaking his hip thereon; suffered great pain; lost fifty-five pounds in weight during his illness; was supposed to be fatally sick for some weeks; that he is permanently injured; incapacitated for the following of his former profession, which was that of an attorney at law. Upon cross-examination the plaintiff is very particular in locating the place of the accident, and is positive that it was within the street proper.

The evidence will be examined as to the two questions:

1. The actual location of the place of the accident. 2. Whether the city is responsible upon the evidence even if the actual location was not in the technical, laid out, and dedicated public street. The evidence upon the location of the place of accident is as follows:

Plaintiff Foxworthy: Ice was on the walk. The location was not far from the corner of the fence east of the hotel; my opinion now is about the middle of the four or five foot walk a little west and south of the fence post, in a northeast direction from the post in the corner of the veranda and southeast direction from the corner of the hotel. I noticed no ice until I fell down or commenced to get up. I had no gloves on. Pulled them off to register in the hotel a few minutes before, and when I went to get up felt the ice with my naked hand. When I fell my first impression was to get right up; I found myself unable to do so. I did not have use of myself I saw the fence corner and went to crawl to it, and so far as I went in that direction I found ice all the way. I changed my mind then and tried to get back to the post of the veranda, but there was ice in that direction, then tried to get to the hotel. About then a gentleman called to me asking if I was hurt. I did not investigate further about the ice that I remember about. The nearest object when I fell was the fence.

Cross-examined: I came out at the east storm door and went southeast. When I went out I saw the fence right in front of me and so went out towards the corner. I could see the fence, located it and got the idea of the direction of the walk. I do not think it was thirty or forty feet from the door. When I went out I saw a man going along. Think he was getting off the hotel front, probably going east, when I started in the same direction. My left foot slipped to the south as I faced east, and I fell on my left side. I had gone to where the sidewalk, near the corner of the fence, joins the walk that goes north on the east side

of the hotel. I was in that shape, with the fence post the nearest object to get up by, as I thought.

Redirect: The fence corner was north and a little east.

Albert Manchester testifies : I went out and found him, plaintiff, lying against the window. It was icy in the center of the walk, ridged up, it had not been shoveled off ; I know it was there icy because I traveled over the walk several times that night and the next morning. Both sides east and west of the picket fence corner on the main traveled walk there was a ridge all along there. This ridge of ice and snow was four or five inches in depth, might be eighteen inches wide in front of the Lepin hotel. The main walk ran down in front of the storm house.

Cross-examined : There was ice and snow there.

William Sheesby: Lived in Hastings last winter at the Lepin hotel. In front of the Lepin hotel the walk was mostly clean, but after going near the corner of the hotel, from there east it began and got uneven with ice and snow. It had been that way several days—three days and from that to a week. I remember from knowing he was hurt there and from slipping a good many times myself on the walk.

Cross-examined : The snow was deposited at the east corner and also at the west corner. They had made an attempt to sweep it off the walk in front of the hotel. It was partly done.

T. R. Piersen : There was some ice and snow from the door of the hotel to a line east of the hotel. There was some ice and snow I think within four feet of the door and along the walk, and in front of and south of the door, there was a ridge of ice perhaps eighteen inches wide. It could not be more than two or three inches deep from the south line of the hotel ; in front of the hotel the snow had not been cleaned off at all; no one lived there very much. In front of the hotel and the walk leading back was cleaned off. The snow had been there more than three

days, somewhere near a week.   Immediately at the south-east corner of the hotel building the walk was in good condition and no down-spout or flow of water at the south-east corner.   The eave spout came down in the back part of the house.   In front of the Lepin building the side-walk and that attached to the building altogether was nine feet wide I think, the whole walk.   The ice and snow was about in about the center of the walk belonging to the city. The storm door extends out from the hotel about four feet.

Cross-examined : The hotel covers about forty feet front. It stands back three or four feet from the street line.   The ridge of ice in front of the house was as near the center of the sidewalk as a man generally walks.   There was snow-bank in front of the hotel drifted near the fence.   When I first saw him, he was leaning against the corner of the hotel.   My men were only instructed to shovel the snow away from the front of the hotel.

Van Sickle : I went out to see the place where it was reported he had fallen and found the sidewalk immediately in front of the hotel, and eastward a little way, slippery. There had been a fall of snow before that, and it had been leaking down on the path from above and leaving that compact snow on the sidewalk.   (The full width of the walk, both public as well their own, in front of the Lepin hotel was covered by a roof and awning or a veranda.)   It would be represented by an ordinary foot-path in the snow by a number of people passing in a single file and then the snow cleaned away at the sides, leaving the path that was made.

Cross-examined: I examined it in the evening I was called to him and looked it over the next morning.   The path that was left was in front of the Lepin hotel and made by going out east of the storm house diagonally from the sidewalk proper.   Upon the sidewalk proper I hardly think there was much.

Redirect : Between the veranda or awning corner and

the fence corner there was a continuation of that kind of walk I have described and right along east and west of the fence corner.

Charles Foxworthy: I arrived at Hastings the Sunday succeeding the Thursday my father was hurt. I examined the walk; there was a ridge of ice or snow and ice frozen hard, very slippery, eighteen inches to two feet wide and three to five inches deep where he was reported to have fallen, just west of the fence corner.

The defense at the present trial was substantially that of the former; that the walk in front of the Lepin house was partially in the street, and partly on the ground of the Lepin house, being a few feet in the rear of the street line, and the walk being continuous from the hotel to the outer edge of the sidewalk. The defense endeavored to show that so much of the sidewalk as lay in the street was clear of ice and snow and was in good condition; that some ice lay on that portion of the continuous walk within the lot line or back from the street, and that the plaintiff's injury occurred there, for which the city is not responsible in damages.

DEFENDANT'S EVIDENCE.

R. R. Kelly: Was acquainted with the Lepin hotel in 1886. The walk and sidewalk in front of the Lepin hotel was then about a foot higher than the walk in front of the lot further east. Going east for four feet it was ascending a little, or slanting from the corner of the fence, eastward ascending.

Cross-examined: The way the walk then was, the plank were continuous and level from the house clear to the edge of the walk. All one length of plank. All outside of the storm door, which projected about four feet, was used indiscriminately by the public to pass over, and all was level out to the fence corner and it pitched a little east for four to six feet.

I. Hall: Was well acquainted with the walks in front

of the Lepin hotel.  Saw them three or four times a day; lived in that end of town.  The width of sidewalk in the city of Hastings on a number of streets was four feet. Could not say how the walk was in respect to snow in January, 1886.  We had lots of snow that winter.  Cannot remember seeing much snow under the porch of the Lepin house and never did.  Passed there every day.  My attention was not called to snow under the porch.  Examined the place about two days after I heard of the accident. Had there been an accumulation of ice and snow in front of the Lepin hotel, a ridge standing prominently up, I certainly would have noticed; never saw any such ridge.

Cross-examined: There had been a good deal of snow over the sidewalks generally that winter.

Rittenhouse: Cannot say I remember the condition of the walks in respect to snow in January, 1886.

Cross-examined : From the gutter line to the house was continuous planking.  There was a step up into the storm door.

Chas. Cameron: In January, 1886, going from my store to the house I always passed the Lepin hotel.  Six times a day.  Have known the property since the fall of 1879.  I remember the time Mr. Foxworthy got hurt.  The walk in front of the hotel to the fence corner was pretty clean. From the corner to the fence east there was a good deal of a drift of snow.  There was a vacant space between the Lepin hotel and the next house called the Van Fleet house, it was drifted in front of the Van Fleet house.  Had there been any snow drifted in front of the Lepin hotel or west of the fence corner I think I would have been able to have seen it.  There was none that I remember of.

Cross-examined : You simply don't remember that there was no impassable drifts along there?  There was none there; there were some east; there were no places where persons may have stepped making a walk and the snow hard down upon the sidewalk; there was east of the corner of the fence.

A. M. Drew : At the time Foxworthy was hurt I was thirty or forty feet east of him. I passed that place six times a day ; it was my usual route of travel to my place of business. The condition of the walk immediately in front or the Lepin hotel, on the 21st of January, 1886, I know. On the sidewalk proper, there were three or four pieces of ice about the size of your hand, aside from this the sidewalk was clear from ice and snow. Walk joining the Lepin hotel was in good condition so far as ice and snow was concerned, except where the spout descended from the corner of the house; there was a piece of ice there as large as your hat. That was where Mr. Foxworthy fell. I turned right around and hurried to him. He was lying down, his body extending northwest and southeast, his head near the window of the hotel. His head was three or four feet from the hotel. The piece of ice on which he slipped and fell was four to four and one-half feet from the hotel I should judge from my knowledge of the sidewalk in front of the hotel. During January, 1886, had there been a ridge along the walk four to six inches high, I certainly would have noticed it. There had been snow falling during the month, but there was none there at that time.

Cross-examined : As I passed, Foxworthy was standing in the door of the hotel, apparently talking to some one inside. I got thirty or forty feet ahead of him when he fell. There was a fence about four or five feet from where he fell. The walk was in good condition except this one bunch of ice where he fell, which was an accumulation of ice evidently from water coming down the spout from the Lepin hotel.

Henry Shedd : Was mayor when the accident occurred. Frequently passed the Lepin hotel over the walk in front of it. The walk was in fair condition. Had there been ice and snow so as to impede public travel I think I should have noticed it.

A. M. Binderup: Was in the grocery business in the winter of 1886. I had to pass the Lepin hotel six times a day in January, 1886. There was considerable snow that winter but it was generally in front of the Lepin hotel clean; but right by the corner of the fence there was nearly all the time a drift.

Cross-examined: From the fence post east it was banked up. I have no recollection of the particular day, January 21st; that was a general thing all that winter. I think the walk in front of the Lepin house was always clean.

Wm. Sheesby: There was no down-spout on the outside of the hotel at its southeast corner, nor any leak from the roof that would make an accumulation of ice, nor any gutter that goes around the house, I think. I was up there to paint the building.

The above was all the evidence offered by either party as to the cause or location of the accident. The plaintiff contends that the evidence conclusively proves a dangerous, icy condition of the walk; that that condition caused the injury, and upon the evidence the jury ought to have assessed the amount of the plaintiff's damages without other consideration in the case; that their verdict has not sufficient proof to support it, and the court erred in not granting the plaintiff's motion for a new trial.

From the careful and laborious review we have been obliged to make of the testimony given on the trial of the case, a considerable portion of which is here presented, we are of the opinion that the weight of evidence—in a very large degree supporting the merits of the action—was with the plaintiff, and that the evidence of the defense is altogether too weak and insufficient to support the verdict. The witness Sheesby, for the defense, denied the evidence of Drew, that the ice was from water coming down the spout from the Lepin hotel, as the hotel was without spouting. This conflict, corrobrated as it was by the witness Pierson, tends largely to impeach the merits of the defense.

53

The testimony of defendant's witnesses, that the casualty of the plaintiff occurred on that portion of the sidewalk adjacent to the hotel, not public but private ground, and for which the city would not be held liable, was the former defense again set up at this trial. The jury were so instructed in the first instance, reported in 25 Neb., 133. The court in that review held that the instruction, as a rule of law, was error, and was improperly given, and as a defense was insufficient. In the opinion it was stated that the entire sidewalk was a part of the street; the six feet and nine inches within the line of the lot was dedicated to the public use, and accepted by the city. A walk being laid there, was an invitation to every person passing along to use it at pleasure. There were no distinguishing marks nor any dividing line drawn between what is claimed to be the sidewalk proper, and that other portion extending toward the building. The whole, therefore, is to be treated as the sidewalk proper, and it was the duty of the city to keep it in a safe condition. We have no lingering doubt of the propriety of this decision, and have no hesitancy in now re-affirming it. Nor is it unsupported by precedents of highly respected authority. In the action of *Weare v. The Inhabitants of Fitchburg*, 110 Mass., 334, a case of striking analogy, where the plaintiff suffered injury on the sidewalk, it appeared that for two or three years there had been, within the limits of the street, as laid out, a smooth and hard walk, four feet wide and a quarter of a mile long, about on a level with the carriage way, and separated and distinguished from it only by a shallow gutter; that much of the foot travel, and in wet weather all, had been on the sidewalk; and that the alleged defect was therein; but it did not appear that the sidewalk was laid out or ever repaired by the city. It was held on review that it was error for the trial judge to rule that, as a matter of law, the sidewalk was not a part of the street which the defendants were bound to keep in repair. The verdict for the defendants was set aside.

There is an affidavit alleging the prejudice of a juror, which sets forth that one of the jurors, after all of the evidence and argument of counsel had closed, and before the jury were charged, or sent to their room to deliberate, stated: "I will hang the jury six times before he (the plaintiff) would ever get a cent." The facts stated in the affidavit were not disputed or traversed. There was also an affidavit of newly discovered evidence, by O. A. Mullon, reporter of the second judicial district of Nebraska, of facts to which he would testify within his knowledge, showing the icy condition of the sidewalk. These were made part of the motion for a new trial, which was based upon the insufficiency of the evidence to sustain the verdict, the bias of the jury, and newly discovered evidence. It may, however, be said that the newly discovered evidence was of a cumulative character, and if the motion for a new trial were based upon that alone, the court would not be justified in reversing the cause.

It is considered an indecency for impaneled jurors to express an opinion on the issues they are sworn to try until they have been charged as to their duties by the court; and if it were absolutely certain that there could have been no misapprehension by the affiant of the utterance of the juror in this instance, it would be regarded as gross misconduct. But without the most convincing proof, by more than one witness, the court would decline to support a reversal on the indiscretions of a juror not taken cognizance of by the trial court.

The judgment of the district court is reversed and the cause remanded for a new trial.

REVERSED AND REMANDED.

THE other judges concur.