## In re I. J. Dunn.

Filed December 23, 1909.　No. 15,637.

1. **Contempt: Notice: Briefs.** "Where an offense in the nature of a contempt is committed in the presence of the court, notice to the offender is not usually essential before punishment (7 Wall. 372); and it is immaterial, where the contempt consists in the use of offensive language, whether it be spoken openly or presented to the court in a written or printed argument (19 How. 13)." *In re Woolley.* 11 Bush (Ky.) 95.

2. ———: **Briefs.** "*A petition* (brief) *for a rehearing* is not a pleading, but an argument addressed to the court and the individual members of the court; and to incorporate into such argument contemptuous, scandalous, or insulting matter, is to commit in open court an act constituting a contempt on the part of the attorney." *In re Woolley*, 11 Bush (Ky.) 95.

3. ———: **Disavowal.** Where the matter spoken or written is of itself necessarily contemptuous, offensive and insulting, the disavowal of an intention to commit a contempt or reflect upon the court or any member thereof cannot justify the act, although it may be considered as tending to excuse, and in mitigation.

4. ———: **Powers of Courts.** The power to punish for contemptuous, insolent, or insulting conduct or language is inherent in every court having common law jurisdiction, without any expressed statutory authority. "The right of self-preservation is an inherent right in the courts, not derived from the legislature, and cannot be made to depend upon the legislative will." *In re Woolley*, 11 Bush (Ky.) 95.

5. ———: **Suspension of Attorney.** "An open, notorious, and public insult to the highest judicial tribunal of the state, for which an attorney contumaciously refuses in any way to atone, may justify the refusal of that tribunal to recognize him in the future as one of its officers; and in a proceeding against him for contempt, if the contumacy be therein manifested, there is no reason why the order revoking his authority until he does comply with the reasonable requirements of the court may not be made." *In re Woolley*, 11 Bush (Ky.) 95.

6. ———: ———. Under a citation to an attorney of this court requiring him to appear before the court on a day and hour designated to show cause why he "should not be dealt with for contempt on account of the language contained in" a brief in support of a motion for rehearing, filed in the office of the clerk of the

court, it is within the jurisdiction of the court to indefinitely suspend such attorney from practice.

7. ———: DUTY OF COURT. A part of the language used and presented in the brief referred to is set out in the opinion, and it is *held* to be the duty of the court to take notice of the same and to apply the required disciplinary penalty.

8. ———: INDEFINITE SUSPENSION. The judgment of suspension was made "indefinite," as stated from the bench, in order that, if at any time respondent made the necessary retraction and explanation to relieve and remove the contemptuous quality of the language used, the judgment would be vacated and the suspension removed, no intention of a permanent disbarment or even of a suspension for a definite time being intended. Until such time as respondent makes the proper and usual amends, the order will stand as made.

PROCEEDINGS for contempt. Motions to vacate order of suspension. *Motions overruled.*

REESE, C. J.

The case of *Anna J. Robinson v. City of Omaha* was appealed to this court from the district court for Douglas county, by the city, from a judgment rendered against it in favor of the plaintiff in the action. Upon the case being regularly submitted to this court, the judgment was affirmed, the opinion being written by Judge ROSE. A motion for rehearing was filed, supported by a brief of 50 pages, and which, from near the beginning to the close, consisted of personal attacks upon "Mr. Justice ROSE," as he is styled and referred to throughout. It must be sufficient to say that, if the use of language means anything, the brief was a studied, deliberate and malicious assault upon the writer of the opinion with the purpose of injuring his standing as a judge both as to his integrity and legal attainments. The brief bore the names of three attorneys of this court. It was stricken from the files, and a citation was served upon each of them in the following form:

"It is ordered by the court that the brief of defendant on motion for rehearing be stricken from the files, and

that Harry E. Burnam, I. J. Dunn and John A. Rine, attorneys for defendant, be cited to appear before the court November 4, 1909, at 9 o'clock A. M., to show cause why they should not be dealt with for contempt on account of the language contained in said brief."

On the return day the respondents appeared, and at their request time until the next sitting of the court was given, when it was shown by typewritten answers that Mr. Burnam, one of the three, was the city attorney of the city of Omaha, and the other two, Mr. Rine and the respondent, Mr. Dunn, were his assistants; that the management of the principal suit of *Robinson v. City of Omaha* was exclusively in charge and control of Mr. Dunn; that he had prepared the brief in their absence; and that they knew nothing of its contents until after it was filed and the citation to them had been issued. It is said by Mr. Burnam that, "had I known of the objectionable features contained in said brief, I would not have permitted them to remain, but would have had them eliminated therefrom." With commendable frankness he expressed his regret and that of his department "for the language in the brief objected to by the court." In his answer to the citation, Mr. Dunn stated that he prepared the brief, and that neither of the other respondents knew of its contents at the time it was prepared and filed, "and neither read it until after the citation had been issued"; that the brief was hurriedly dictated, and, owing to the shortness of time, it was "printed as rapidly as possible, and filed in this court." This is followed by a somewhat lengthy history of the case of *Robinson v. City of Omaha,* stating that he believed the evidence upon which the verdict was rendered against the city was in every essential feature wilfully false; that the defendant in the case had been outraged by the verdict; that the verdict was not supported by the evidence; "that there was no basis for the liability against the city"; that at least two of the instructions given to the jury were erroneous, and at least one reversible error had been committed with reference to the introduction of evidence;

that he felt sure the judgment would be reversed in this court, and was satisfied that this court would conclude that the testimony given on the trial was knowingly false, and was therefore convinced that this court would not hold that the verdict was supported by sufficient testimony, but was based principally, if not entirely, upon "the opinion, conclusions and conjectures of the plaintiff"; that, "when the opinion of the court was announced sustaining the judgment of the lower court," he "was not only surprised and disappointed, but felt that the judgment of the court was wholly wrong, and that there could be no possible theory of the law upon which the verdict of the jury could be legally upheld"; that he obtained a copy of the opinion, and became convinced from reading it that the opinion was not sound, and that due weight and consideration had not been given to the reasons urged by the attorneys for the city in their brief as to why the judgment of the lower court should be reversed; that he was satisfied that the complaint regarding two instructions given by the trial court had not been given due consideration, and that the complaint as to one of them had been entirely overlooked or disregarded; that he undertook to point out to the court why the opinion and judgment should not be adhered to; that he believed that his client was about to be wrongfully deprived of its property, and that the opinion of the court was based upon erroneous propositions of law, and a misconception and misconstruction of the evidence in the case; that he undertook to discuss the opinion of the court the same as he would discuss similar propositions of like importance in the brief of the opposing counsel; that he had but one object in view, which was to convince the court, if possible, that the opinion was not sound, and that due weight had not been given to the arguments presented on behalf of the city, and to protect it from what he considered an unjust verdict; that he had no interest of a personal nature in the result of the case; that if the verdict were sustained the legal department of

the city would in no way be blamed on that account; that he was simply an officer of the city, and it was his duty to protect its interests by presenting its side of the case to the court; that in writing the brief he was actuated by no other purpose than to properly represent the client on whose behalf he appeared, and to protect its interests to the best of his ability; that he did not intend to reflect upon the honor, dignity, or integrity of the court; that he intended to criticise the opinion of the court, and to criticise the reasons given by the writer of the opinion for the conclusions reached; that he intended to do that with all the force, energy and ability that he possessed; that he presumed he had a right so to do; that "the brief was intended for the consideration of the court alone, and not for public consumption"; that the judgment announced was the final judgment of the court, subject to its power to grant a rehearing, or, if the motion for a rehearing were overruled, the judgment would remain the final one. The closing part of the answer is as follows: "I deny that I intended to in any way reflect upon the court or any member thereof, or to obstruct its proceedings or hinder the due administration of justice."

Upon considering the three answers, the court ordered the dismissal of the proceedings against Mr. Burnam and Mr. Rine, fully exonerating them, their showing being all that could rightly be required, it appearing that if any wrong had been perpetrated they were entirely blameless. The matter as to Mr. Dunn was held for further consideration and hearing at a specified time. At the time fixed he appeared personally at the bar of the court and practically reiterated what was said in his written answer, as above given, urged that the case of *Robinson v. City of Omaha* had been finally disposed of, and that he could not be legally called to account for language used in his brief filed in the cause in support of his motion for rehearing, and, further, that the brief was intended only for the eyes of the court, and not the public, and therefore he could not be held to be in violation of any of his rights as an officer

of the court. He again stated, in substantially the language of his answer, that he did not intend to reflect upon the court or any member thereof. The matter was then taken under advisement until the next day, when it was announced from the bench that the answer of Mr. Dunn, together with his oral remarks, were not deemed sufficient, and that the unanimous decision of the court was that he be indefinitely suspended and debarred from practicing in any and all courts of record within this state.

We have sought, here, to give a fair and just synopsis of Mr. Dunn's defense, even at the r: k of being prolix, in order that a full understanding of the case may be had.

Subsequent to the order of the court suspending respondent, he filed a motion for the vacation of the order, basing his application largely upon the alleged want of jurisdiction to make the order in this kind of a proceeding, and in support of which his counsel filed a brief on the law of "Contempt Disbarment." Before any action was had on the motion he filed an amended motion to vacate the judgment, assigning as his grounds therefor:

"(1) That contempt proceedings and disbarment proceedings are entirely separate and distinct, and a judgment of disbarment cannot properly or lawfully be entered in a case of contempt proceedings.

"(2) That power to punish contempts of court by fine and imprisonment, as provided by section 669 of the code, operates as a limitation upon the manner in which the power of courts with respect to punishment for contempts can be exercised and is a negation of all other modes of punishment.

"(3) That the establishment of a proper precedent and a proper determination of the law in the state of Nebraska requires that the said order and judgment of disbarment be vacated.

"(4) That the judgment of disbarment entered herein is the taking of a property right from this defendant, namely, the right to practice his profession and support himself and family, without due process of law.

"(5) That no complaint or information was ever filed against this defendant setting forth any facts or any charge upon which any judgment of disbarment could be legally based.

"(6) That no opportunity was ever allowed or given this defendant to make answer or defense to disbarment proceedings.

"(7) That the hearing which was had herein related solely to the alleged *contempt* of this defendant, and was in response to the order of this Honorable Court that this defendant and others show cause 'WHY THEY SHOULD NOT BE DEALT WITH FOR CONTEMPT OF COURT ON ACCOUNT OF THE LANGUAGE CONTAINED IN SAID BRIEF.'

"(8) There has been no finding of facts by the court sufficient to authorize or justify the entry of a judgment disbarring this defendant, or even sufficient to justify or authorize the entry of a judgment for contempt.

"(9) The finding of the court that the said I. J. Dunn failed and refused to 'maintain the respect due to the courts of justice and to judicial officers' and has failed to abstain from 'offensive practices' is not a finding of any fact defined by the statutes or known to the common law as constituting a contempt of court, but is a mere conclusion and declaration on the part of the court unsupported by the finding of any fact as to any act on the part of the said I. J. Dunn.

"(10) The alleged contemptuous conduct on the part of the said I. J. Dunn not having occurred in open court, nor in the presence of the court or of the judges thereof, and the court having failed to set out or specify the language complained of as constituting a contempt of court, or as constituting grounds of disbarment, the court was without right, authority or jurisdiction to proceed in the matter, and was without right, authority or jurisdiction to enter an order in suspension or disbarment, either as a punishment for contempt or any other alleged misconduct on the part of the attorney.

"(11) The writing and filing of the brief referred to in the order citing this defendant to show cause why he *'should not be dealt with for contempt'* was not disorderly, contempuous, or insolent behaviour toward the court or any of its officers *in its presence,* and does not come within the terms of section 669 of the code relating to 'contempts,' and is not actual contempt under said section or the common law, but relates, as do also the findings of the court, to 'duties' of attorneys as set forth in section 5, ch. 7, entititled 'Attorneys.'

"(12) The court having failed to make, file or cause to be filed any information or complaint, setting out or specifying the facts or language complained of, and the said I. J. Dunn having had no opportunity under any disbarment proceeding to answer any such charge, and therefore not having had his day in court, this court was without right, authority or jurisdiction to pass upon or pronounce judgment upon his right to continue as a practicing attorney.

"And, upon the sustaining of this motion, the said defendant, as in his original motion filed herein, again respectfully requests this Honorable Court, before taking any further proceedings, to allow and permit him, as he desires to do, to expressly retract and withdraw the statements contained in his brief which are considered and declared by the court to be improper and disrespectful, and to allow and permit the said defendant to render to this Honorable Court complete apology therefor."

It is first contended in the brief, above referred to, that the power to punish for contempts committed in the presence of the court, or otherwise, is expressly conferred by statute, citing sections 669, 670 and 671 of the code. It may be noted that the sections cited do not in any way refer to attorneys or other officers of the court as the offending parties, but it is intended for the protection of the courts and their officers. It cannot be contended that the power of the court is limited or restrained by the provisions of the above sections. We apprehend that they are

but declarative of the common law, as far as their pro-
visions go, but do not circumscribe the powers of the
courts. In *Kregel v. Bartling,* 23 Neb. 848, we said: "The
power to punish for contempt is incident to every judicial
tribune, derived from its very constitution, without any
expressed statutory aid. The doctrine in these broad terms
is generally asserted and is believed to be sound; the nar-
rower doctrine, about which there is no dispute, is, that
the power is inherent in all courts of record"—citing a
great number of cases. It is also to be observed that there
is no statutory provision in this state conferring, limiting,
or controlling the power of the courts of the state in the
matter of the suspension or disbarment of attorneys, but
that that is left to the inherent powers of the courts un-
affected by any legislative sanction or limitation, except
section 6, ch. 7, Comp. St. 1909, which was evidently not
intended to limit those inherent powers.

Before proceeding to notice the holdings of the state
courts, and of this court, upon the question of disbar-
ment, we will give attention to some of the cases cited by
respondent in his brief.

*Ex parte Bradley,* 7 Wall. (U. S.) 364, was where the
supreme court of the District of Columbia entered an or-
der striking the name of Bradley from the rolls of that
court for contemptuous language used to the judge of the
criminal court of that district. The holding was that the
two courts were separate and distinct. The conclusion of
the supreme court is "that the judges of the court below
(the supreme court of the District of Columbia) exceeded
their authority in punishing the relator for a contempt of
that court on account of contemptuous conduct and lan-
guage before the criminal court of the district, or in the
presence of the judge of the same," and a mandamus was
issued to that court directing *it* to restore Bradley's name.
It requires no discussion to show that the case is no au-
thority and furnishes no light in this. However, a vigor-
ous and searching dissenting opinion was written by
Justice Miller, in which he combated the decision of the

majority of the court as to its right to issue the writ in any case of disbarment.

*Ex parte Robinson,* 19 Wall. (U. S.) 505, is cited as a controlling decision by the supreme court of the United States. That it has no possible bearing upon this case must be conceded from the perusal of the first paragraph of the opinion by Judge Field. In that case the grand jury of the United States district court for the western district of Arkansas reported to the court that it had been unable to procure the attendance before it of a certain witness, and that the witness had been seen in the company of attorney Robinson, and had soon thereafter disappeared, and service of the subpœna could not be had. The court without further showing ordered that Robinson and others named show cause why they should not be punished for contempt, the deputy marshal being one of the persons cited. Robinson filed the response for the deputy marshal, when the court informed him that a rule was against him, also. Robinson responded that he was aware of the fact, and in the course of the conversation which followed; and in which the court, for the first time, directed the clerk to formulate the order in writing, Robinson remarked: "I shall answer nothing"—when the court cut him off without permitting him to complete the sentence, which would have been, "until the order to answer the rule in writing shall be served upon me," and immediately ordered the clerk to strike his "name from the roll of attorneys, and the marshal to remove him from the bar." A mandamus for reinstatement was sought against the judge. The supreme court held that the district courts of the United States were courts of limited jurisdiction; that what powers they had were derived from the acts of congress, and not from the constitution; that the courts themselves were created by act of congress; that "their powers and duties depend upon the act calling them into existence, or subsequent acts extending or limiting their jurisdiction"; that "the act of 1831 is, therefore, to them the law specifying the cases in which summary punishments for contempts

may be inflicted"; that "it limits the power of these courts in this respect to three classes of cases: (1) Where there has been misbehavior of a person in the presence of the courts, or so near thereto as to obstruct the administration of justice; (2) where there has been misbehavior of any officer of the courts in his official transactions; and (3) where there has been disobedience or resistance by any officer, party, juror, witness, or other person, to any lawful writ, process, order, rule, decree, or command of the courts," following the provisions of the statute. It must therefore appear to the most casual reader, whether learned in the law or not, that no light can be drawn from that case, as the district court clearly exceeded and went beyond its jurisdiction.

*State v. Sachs,* 2 Wash. 373, 26 Pac. 865, was where an attorney had made use of improper language to the court while in session. The court imposed a fine for the contempt, and ordered that the attorney stand committed to the custody of the sheriff until the fine was paid, and that he purge himself of said contempt. The attorney paid the fine. Several days later he appeared in court and asked to be heard as to a matter therein pending, when the judge refused to allow him to proceed, and, upon the failure of the attorney to further purge himself, the court refused to hear him, and ordered that the said attorney "will not be permitted to appear as an attorney or counselor before this court until he does comply with said order, and until the further order of this court." It was held by the supreme court that the second order was void, and a mandamus was granted for reinstatement of the attorney. Upon just what ground the writ was granted does not very clearly appear from the opinion. If it was that the court had exhausted its jurisdiction in imposing the fine, the decision was no doubt correct. If it was on account of the hasty action of the court without citation or opportunity to be heard, it was probably equally so. If it was, as suggested, that there was no foundation for the pre-

ceedings which led to the second order, the holding can be approved, for there clearly was none.

*Withers v. State,* 36 Ala. 252, was where the mayor of the city of Mobile refused to allow the relator, who claimed to be an admitted practitioner, to appear before him in the police court of the city for the purpose of defending persons charged with violations of the city ordinances. An application was made to the state circuit court for a mandamus to compel the mayor, sitting as the judge of' the police court, to allow the relator to appear for his clients. The writ was allowed by the circuit court, but the judgment was reversed by the supreme court upon the ground that it did not appear that the relator was a licensed attorney authorized to appear in any of the courts of the state. The contention that he was not was presented by the return of the mayor. There were no disbarment or contempt proceedings pending anywhere. The mayor had simply told the relator that he would not be heard. The mandamus was refused. The court then, by a dictum, decided that, if a person were a duly admitted attorney, he would have the right to practice his profession in the mayor's court, but, owing to the fact that the relator had failed to show that he was so admitted, the judgment of the circuit court granting the writ was reversed. (It might properly be noticed that the law of Alabama specifically provided for what reasons an attorney might be suspended or disbarred, but those provisions had no application to the case decided.)

*State v. Goode,* 4 Idaho, 730, 44 Pac. 640, was where, under the provisions of the statute fully prescribing the procedure in disbarment proceedings, the district attorney, after an investigation by a committee appointed by the court, filed his information against the accused. The cause was docketed, and notice issued and served, and a committee appointed to make an investigation and report the facts to the court. The accused moved for a change of venue on account of the prejudice of the judge. The objection was overruled. The accused applied to the su-

preme court for a writ of review and for a mandate to compel the district court to allow the change of venue, and also to direct the judge to set aside an order made, at the time of the filing of the information, depriving the accused of his right to bring or defend any causes in said court, except those on the calendar, in which he appeared as attorney. The writ of review was denied, but it was held that the district court could not rightfully suspend the accused *pending* the proceedings against him; that he was entitled to his day in court before he could be suspended or disbarred, hence that part of the order suspending the accused before the final hearing was vacated, and certainly properly so.

The state of North Dakota has enacted specific and elaborate provisions for proceedings for contempts, and also, by separate provisions, for the procedure where disbarment is sought. By no stretch of construction or interpretation can the law in one case be made applicable to the other. The provisions are entirely independent, and are framed with the evident purpose of covering and including the whole of the law applicable to each case. Under those provisions the decision of the supreme court in *State v. Root*, 5 N. Dak. 487, was made, and the case is cited by respondent. In that case the state's attorney presented to the district court a number of affidavits purporting to contain charges against the accused of various criminal contempts of court committed at divers times and places. Upon the filing of the affidavits, the court ordered that cause be shown at a certain time why the accused should not be punished for contempt of court, and why he should not be debarred from practicing law in that court and county. At the time named the cause was called for trial, when the accused sought to except to the jurisdiction of the court, but was not allowed to do so. He filed a motion to vacate the order to show cause, but that was overruled, "the defendant not being permitted to present any argument or explanation as to said motion." The defendant filed his answer, a trial was had,

and a judgment was entered finding the defendant guilty of contempt, and adjudging and directing "that defendant be confined in the county jail of Barnes county, North Dakota, for a period of thirty (30) days, commencing at noon of this 4th day of January, A. D. 1896, and that he pay a fine of two hundred ($200) dollars to the clerk of this court; that, in case of default made by the defendant of the payment of this fine, that he be committed to the county jail of Barnes county, North Dakota, until such fine is paid, or for a period not exceeding thirty (30) days; that defendant's imprisonment for nonpayment of said fine shall commence at the expiration of the first term of period of the defendant's imprisonment herein mentioned; and that defendant be suspended from further practicing law in this court until the further order of this court; and that a commitment be issued to carry this judgment into effect." It is shown by the opinion that the whole of the conduct of the accused was the indulgence of language concerning the official and private character of the judge uttered at various times upon the streets, in stores and in public places in the city of Valley City, but in no case within the presence and hearing of the court while in session. In one instance he had said in the court-room, and while the court was in session, that the defendants in certain criminal prosecutions, addressing them in the hearing of others, were "chumps" for having attorneys to defend them; that the judge would look out for them; that he knew what he was there for; that he understood his business; that he knew what he was elected for, and that they need not fear. But there was nothing to show that the court was there actually in session or that the judge knew of the language used. The defendant appealed from the judgment, and it was reversed upon two grounds; one, that the charge for contempt and proceedings to disbar was an attempt "to fuse and mass together in one proceeding two distinct special proceedings, which are wholly independent of each other, not only with respect to the results which each is designed to accomplish, but

with respect as well to the practice and procedure laid down in the statute for the government of each respectively"; the other, that the court had arbitrarily refused to allow the accused to present his objection to the jurisdiction, or to permit him to be heard in his defense by way of argument or explanation or to listen to the law bearing upon the case, the holding being as well that there was no jurisdiction in that proceeding to try the accused for contempt. The penalty imposed was the highest permitted by the law.

The case of *People v. Kavanagh,* 220 Ill. 49, is also cited. In that case the petitioner had been adjudged guilty of contempt of court in the superior court of the county, for conduct in the presence of the court, and sentenced to imprisonment in the county jail of Cook county. On the same day he sued out a writ of habeas corpus before a judge of the circuit court to obtain his discharge from the imprisonment, and was released on bail pending the hearing of that application. After his release he appeared in the same court, before the same judge, in causes which he had pending in the court, but the court refused to hear or recognize him as an attorney, and, without any proceeding to suspend or disbar, the judge stated to him that, until the contempt committed on a previous day was atoned for or the judgment satisfied or vacated, he would not permit the attorney to appear before him. A mandamus was granted directing the judge to allow the accused to proceed with his cases. The holding of the court, as stated in the syllabus, was that, where an attorney was sentenced to imprisonment for contempt and was released on bail pending habeas corpus, it did not revive the right of the judge who imposed the punishment to again punish for the same contempt and refuse to allow the attorney to appear before the court until the conviction was satisfied or set aside. It was held that the right of suspension from practice in an inferior court of the state, and one from which his right

to practice did not emanate, was vested in the *nisi prius* courts only by virtue of the statute.

We have thus examined all the cases quoted from in respondent's brief, except *State v. Graves*, 66 Neb. 17, *Jackson v. State*, 57 Neb. 183, and *State v. Livscy*, 27 Neb. 55, and, including those, we have found none which to our minds throw any light upon the case now before us.

The question remains: Has this court the authority or jurisdiction to indefinitely suspend a practitioner at its bar for the acts committed, under the citation issued, after a patient hearing and full opportunity for the respondent to be heard, both in writing and orally, and full extension of time in which to present his defense has been given? So far as this court is concerned, we are not without a precedent for our guidance in a case almost identical with this. Owing to the high standing of the attorney involved, we will omit his name, but refer to court journal "C" of this court, at page 19, where the record may be found. A case had been decided, and leave was asked to file a motion for rehearing. The application was supported by a printed brief in which the decision of the court was referred to as the "evasive presumption of an advocate, and not the judicial presumption of a court," and either "a monstrous error or a monstrous crime." The introduction or caption of the entry is: "And now on this 10th day of April, 1878, came on to be heard the matter of the contempt of ————, attorney at law, and practicing in this court." The body of the entry proceeds: "And the court being fully advised in the premises, and the said ———— appearing in open court and at the bar hereof, and refusing to purge himself from said contempt, or to apologize to the court, it is therefore considered and adjudged by the court that the said ———— be, and he is, hereby suspended from any further practice as an attorney of this court, or in any case pending herein or hereafter brought, until such time as he shall purge himself of such contempt and until the further order of the court." The matter thus stood until the 20th day of July

of the same year, when the offensive language was withdrawn, and the attorney was restored to his former place at the bar of the court. At that time the court was presided over by Honorable DANIEL GANTT, Chief Justice, and Judges SAMUEL MAXWELL and GEORGE B. LAKE, three of the most capable men who have sat upon this bench, and whose judgments have at all times carried weight. No opinion was written, and the case was not reported.

*In re Woolley*, 11 Bush (Ky.) 95, is almost identical with the present one. Woolley had made use of offensive language in a motion for rehearing filed in the court of appeals of Kentucky. The court issued a rule requiring him to show cause why his authority to practice as an attorney in said court should not be revoked and that he be otherwise punished for the contempt. He appeared, and, while declaring that he meant no disrespect to the court or its members, he failed to retract or in any way withdraw, explain or apologize for the language used. Much the same contention was made as in this case, that the power of the court to punish for contempt was limited by the provisions of the statute. The court did not adopt this view, and not only made the rule absolute, but imposed a fine and rendered judgment for the costs. We quote a clause of the syllabus: "An open, notorious, and public insult to the highest judicial tribunal of the state, for which an attorney contumaciously refuses in any way to atone, may justify the refusal of that tribunal to recognize him in the future as one of its officers; and in a proceeding against him for contempt, if the contumacy be therein manifested, there is no reason why the order revoking his authority until he does comply with the reasonable requirements of the court may not be made."

*In re Pryor*, 18 Kan. 72, involves questions, on principle, quite similar to those under consideration. Pryor had written an insulting letter to the judge concerning a case pending in the court. A warrant was issued for the arrest of the writer, and when brought before the court

he was fined for the contempt and suspended from practice until the fine should be paid. On appeal to the supreme court the judgment and order were affirmed.

In *Ex parte Secombe*, 19 How. (U. S.) 9, the supreme court of the United States refused a mandamus to the supreme court of the territory of Minnesota to restore the relator to practice after his disbarment by that court. It was shown that the removal was for a contempt committed in open court, and the proceedings were instituted by the court upon its own motion. The accused had no notice that he had been disbarred until after the adjournment of the term of the court, and had never been informed that the action was about to be, or had been, instituted against him. The writ was refused, the court holding that jurisdiction of the subject matter existed; that the court acted judicially, and that the question of the erroneous or irregular action of the court gave no ground for mandamus.

In *In re Philbrook*, 105 Cal. 471, Philbrook had filed a brief, which is referred to in the order of the court citing him to appear as being of a "scandalous and contemptuous character." The usual proceedings were inaugurated, and the attorney was prohibited from practicing in any and all the courts of the state for the period of 3 years, and thereafter until the further order of the court removing such suspension. The legal proposition is stated in the syllabus as follows: "Where an attorney at law has filed in the supreme court a brief in which he has violated his duty as an attorney by the use of unwarrantable language in assailing a justice of the supreme court, with intent to commit a contempt of the court, and by palpably attempting to influence the decision of the court by appeals to the supposed timidity of its justices, the attorney guilty of the same should be suspended from his office as an attorney at law."

*In re Breen*, 30 Nev. 164, was where the supreme court of Nevada had reversed the judgment of the district court in a capital case in overruling a motion for a change of

venue. The reversal was duly certified to the district court, the venue changed, and the accused removed from the courtroom. The district attorney then arose "to the question of privilege" relative to a statement made in the opinion filed by the supreme court. A part of the district attorney's statement was that the portion of the opinion referred to was "absolutely not the fact; further, that there is nothing in the records from the first page to the last which suggests or would warrant the supreme court in making such a statement in its decision, and where anything is shown on that record upon which the supreme court renders such a decision is beyond my understanding." Upon the conclusion of this statement by the district attorney the district judge, then presiding, commended the district attorney for what he had said, joined with him in denouncing the clause in the opinion as "absolutely without foundation"; that "the statement in the opinion as written by Judge Norcross, to which objection has been made, like some other assertions in the same abnormally strange document", was, in his opinion, neither fair to the district attorney nor to the court over which he (the judge) presided, and "whether or not it was made for the purpose of bolstering up a decision" which to his mind was "neither founded on law nor supported by fact", it was "highly reprehensible for its author, or authors, to have made it"; that it was "reprehensible if the court knew what it was doing, pitiful if it did not", and ordered the statements made by the district attorney and the court to be spread upon the record, which was done. Upon these facts being brought to the attention of the supreme court, the attorney general was ordered to investigate and to present the facts to the court in the form of an affidavit. This was done, and the court ordered citations to issue to the judge of the district court and the district attorney to appear and to show cause why they should not be adjudged guilty of contempt of court and punished accordingly, and that they show cause why they should not be guilty of conduct unbecoming mem-

bers of the bar of the state and be disbarred. A hearing was had in the supreme court, separate opinions of considerable length being written, and orders were entered disbarring the judge of the district court unless he caused the language and order entered of record to be expunged within 20 days, and suspending the district attorney from practice for 30 days. Upon the hearing the district attorney, being convinced of his error, confessed it, and with commendable frankness disavowed intentional wrong and manifested a willingness to make all amends possible, and received the favorable consideration of the court, his sentence being a mild one. The district judge presented, in part, the same contention as here insisted upon, viz., that the language was with reference to a decision in a case no longer pending; that the sections of the code of that state providing for punishments for contempts was a limitation of the powers of the court in that behalf; that he had the same right as any other citizen to criticise the past action of the court; that, while the information given him by the district attorney was incorrect, yet it was made and believed in good faith, and, believing that the supreme court had purposely gone outside the record to reflect upon the district attorney and to insult the judge and criticise his rulings, he had pursued the course adopted. All these contentions were overruled, with the result stated.

In *Michel De Armas' Case,* 5 Martin (La.) 64, De Armas filed a motion for a rehearing in *St. Romes v. Pore,* shortly before that time decided, and the court, "having noticed indecorous expressions" in the application, "requested the clerk to draw his attention thereto." On the report of the clerk that the attorney "declined amending his application, an order was made that he answer for the contempt." He appeared, admitted the authorship of the paper, and suggested that the court were disposed to punish him as the author of a prior publication in which he denounced the declaration made by

43

the court on a former occasion. The court then, without further proceedings, entered an order suspending him from practice for 12 months.

In *Blodgett v. State,* 50 Neb. 121, it was held by this court that a charge of malpractice against an attorney and counselor at law could be joined in the same information with one for contempt, where both involved a single transaction.

It would seem from this review of authorities cited, and consulting the former decisions of this court, that there can be no room for doubt that the proceedings in this matter are well within the rules of law, and under a citation, as in this case, the legality and validity of the order of indefinite suspension must stand until the proper action is taken by respondent, provided the course pursued by him will warrant any action on the part of the court. It was not our purpose to quote or more than refer in a general way to the statements in the brief referred to, but the case seems to demand that some specific reference be made. In doing so, owing to its length and the number and times and instances in which the objectionable language occurs, it will be difficult to fairly state them without extending this already lengthy opinion beyond reasonable limits. We make a limited number of extracts. On page 10 of the brief the following occurs: "It would seem that unless the city of Omaha is to be singled out and denied the same protection of the laws accorded to railroads and street railways, it must be held that instruction 10 was erroneous. On the first page of the opinion it is stated: 'In her petition plaintiff states in substance that there was nothing under the west end of the board walk to support it.' I submit that no such statement appears in the petition. On the contrary, the allegation of the petition was, and the contention of the plaintiff and her witnesses at the trial was, that the dirt was under the west end of the north stringer of the four-foot sidewalk, which permitted the west end of that stringer to sink down an inch or two when the north side

of the walk was stepped on. This would seem to show that Mr. Justice ROSE started out without understanding or having clear in his mind what the complaint of the plaintiff was, or just what negligence was charged against the city which it was claimed contributed to the accident which befell the plaintiff." On page 12, after referring to a case cited in the opinion, he says: "But it was scarcely necessary for Mr. Justice ROSE to go clear across the continent to discover the law with reference to defects which render the city liable for damages on account of a difference in elevation or lack of uniformity in the level of sidewalks. He might have turned to the case of *Forbes v. City of Omaha,* 79 Neb. 6, decided by this court on May 10, 1907, or *Foxworthy v. City of Hastings,* 31 Neb. 825, and discovered that this court does not agree with the decisions cited from the state of Maine." On page 14 he uses the following language: "I am not aware, of course, where Mr. Justice ROSE has been in the habit of seeing and using sidewalks. Nor where he obtained the information which enabled him to become a sidewalk expert, and inject into this case the evidence submitted in the opinion, that the condition of the board walk was not dangerous or evidence of negligence." On page 17: "Upon what theory, then, other than the arbitrary determination to sustain the verdict of the lower court, can it be said that eight inches of an elevation is entirely safe, and not even evidence of negligence, but nine inches rendered the walk dangerously defective? A verdict based upon such testimony, and upheld by an opinion sustained by such reasoning, reduces the law to a farce. In the opinion Mr. Justice ROSE makes the following statement: 'There is also testimony which shows that prior to the accident the section of the wooden sidewalk at the west end had been in a loose, rickety and rocking condition for several years.' I deny the correctness of the above statement. I submit that the testimony does not show anything of the kind, and that there is not a syllable in the evidence of any witness that even tends to sustain such

proposition." On pages 18 and 19: "I shall quote this testimony for the purpose of showing that Mr. Justice ROSE selected isolated statements from the testimony of the witnesses whom he chose to quote from at all, and set out the evidence of the witnesses, statements which were as positively contradicted or denied on cross-examination. Mr. Justice ROSE may be able to explain upon what principle of justice between litigants such testimony is quoted for the purpose of sustaining the judgment of the lower court, while he entirely ignored every syllable of evidence in the record which fairly presented the facts of the case. It appears to me that the writer of the opinion felt that the exigencies of the case were such that he was at liberty to ignore all of the evidence in the case except that favorable to the plaintiff, and to only select such portions as would have a tendency to support the judgment of the lower court, even when the portions selected had been rendered worthless by other statements and explanations of the witnesses themselves. And the construction placed upon the testimony such as the writer saw fit to quote, I submit is unfair, strained and distorted. The construction, however, was necessary because in no other way could a reversal of the judgment possibly have been avoided. The same methods, it will be found, were followed with reference to the testimony of other witnesses as well as that of Romano. The testimony of Mrs. Robinson was handled in the same way. And yet I submit that no candid mind could even casually examine the testimony of Mrs. Robinson, without reaching the conclusion that her testimony was wilfully false, and that the verdict in this case was obtained by perjury on on the part of the plaintiff. And it would seem that courts ought not to deem it their duty to place a strained, unfair and unreasonable construction upon testimony to sustain a verdict obtained by perjury and fraud." Pages 20, 21: "When the court is forced to rely upon such testimony, dragged from the witness under a command to answer a question in a particular way, which the witness

at half a dozen times denied knowing anything about, no wonder those who approved the majority opinion felt it necessary to offer some sort of an apology for the testimony which they were compelled to rely on, and admit that its strength had been greatly affected by other portions of the testimony of the witness, and had been greatly weakened on cross-examination. * * * Well, let us see just what the facts were as shown by the testimony of Romano and other witnesses. Not what conclusion Mr. Justice ROSE draws from such portions of the testimony as he sees fit to quote, but what the testimony of the witness Romano as a fact discloses." Page 28: "I submit there is no justification for the attempt on the part of Mr. Justice ROSE to extort from the testimony of Romano a statement as per his own construction, that the walk at the point where the injury occurred was 'rickety' for several years prior to the accident. I repeat there is no such testimony in the record, and the testimony quoted by Mr. Justice ROSE cannot be construed as referring to the condition of the walk prior to the time the cement walk was laid." Page 29: "It seems to me that it requires a good deal of assurance on the part of this court to declare that a walk over which every witness who testified, that knew anything about it, traveled four times a day, one for four years, and the other for five years, in absolute safety, and found no defect, no unsafe or dangerous condition, no inconvenience and no difficulty, to declare that that sidewalk was for years unsafe and dangerous for public travel, and base that conclusion upon the statement that it was 'rickety.'" Page 30: "Again, Mr. Justice ROSE read the record by some peculiar method of his own, through which he discovered a good deal that was not there, and failed to discover a good deal that was there." Page 32: "And yet it is upon this kind of testimony, picked out evidently for a purpose, that it is sought to sustain the outrageous verdict in this case." Pages 35, 36: "So, for the purpose of this case, we cannot accept the opinion of Mrs. Robinson that she might have stepped

upon the walk if it had not raised an inch or two, that she might not have caught her foot if the walk had not tipped up, and the testimony of a similar character given by her sister. Reinforce her opinion by that of Mr. Justice ROSE that 'plaintiff might have done so, too (stepped upon the walk), except for the tipping of the walk, is altogether probable,' and we still have nothing but opinion, based upon what probably would or would not have occurred. If this court is ready to enter upon the task of revolutionizing the law, in that proof is no longer necessary, and that all that is required to rob a city or befoul a name is a probability drawn as a conclusion from an opinion based on nothing, the court has certainly made an excellent start." Page 40: "I find this also in the opinion: 'That, at the time and place of the accident, the sister and companion of plaintiff stepped on the wooden walk first without falling.' The evidence does not support this statement. Mr. Justice ROSE was again compelled to turn to the speculations, guesswork and conclusions of Mrs. Robinson and Mrs. McWhorter." Pages 41, 42: "Then ∙Mr. Justice ROSE goes on to say: 'And that plaintiff might have done so, too, except for the *tipping of the walk, is altogether probable.*' Good Lord, yes! Most any old thing is probable. But how about proof? If the statement, 'that plaintiff might have done so, too, except for the tipping of the walk, is altogether probable,' constitutes proof, then we have read the law in vain. Here we have the basis of this opinion. Here we have the theory of the case upon which this court undertakes to say that a verdict may be sustained, finding that the city was negligent and that the defect complained of was the proximate cause of the accident. Does Mr. Justice ROSE undertake to say from the testimony which he has quoted, which he says justified the court in submitting the case to the jury, that the evidence shows that Mrs. Robinson would have stepped up on the walk, that she would not have caught her foot, if the walk had not tipped up? Oh, no. Even the portions of her testimony

which he has quoted from the record would not enable him to face the proposition that it constituted proof of anything of the kind. So he does not pretend that it proves anything, but that it creates a condition of affairs from which the jury might guess and speculate and conjecture, from which the jury might say that *'Mrs. Robinson might have done so, too, except for the tipping of the walk, is altogether PROBABLE.'* " Pages 45, 46 : "Will Mr. Justice ROSE direct the attention of this court to a decision by any court in the land, or to the language of any text-writer, holding that a verdict may be sustained, which is based upon the probability that the defect complained of caused the injury? Are there any adjudicated cases, except this, that have ever recognized a mere probability sufficient proof of the cause of an accident or the existence of a defect? Let me say that there are none. Let me say, furthermore, that Mr. Justice ROSE found none, and can find none, and that the decisions here cited, which he saw fit to ignore, state the rule as recognized by every court that has ever passed upon the question." Page 50 : "I take it that it is not necessary to cite authorities in support of the proposition that the complainant must recover on account of the defect and negligence complained of in her petition, or not at all. That it is immaterial what other defects may have existed at the time and place where the accident occurred; that such defects and dangerous conditions, if any, cannot be taken into consideration, but that the jury must be instructed that they must find that the identical defect, and no other, named in the petition, was the proximate cause of the accident, and that the city was guilty of negligence with that particular defect. The language quoted from the instruction by Mr. Justice ROSE was a gross violation of that rule."

It requires no argument to show that the foregoing consists of a flagrant violation of the rules of legitimate argument and was so clearly intended as an exhibition of disrespect as to call for such explanation as an attorney

who, upon his attention being directed to the subject, would and should willingly make. We have never known or heard of a court, no matter what its standing, whether of original or appellate jurisdiction, which did not, under pressure of labor imposed, make mistakes in the application of the rules of law and examination of evidence. The history of the whole country shows this to be the case, and that same history demonstrates the fact that they are all ready and anxious to correct the errors which have been made in their rulings and decisions. The history of this court, as shown by the many rehearings granted, and arguments permitted and called for on motions for rehearing, is a demonstration of its entire and patient willingness to rightly apply the rules of law and promote its just administration. And it may be truthfully said that none are more willing to grant the fullest opportunities than the judge who wrote the opinion and who has been thus unjustly personally assailed. There is no possible disposition to question the right of any and every person to criticise the actions of the court or its judges, but if the officers of the court, as attorneys are, are permitted to assail the judges, by briefs or other papers filed in and made a part of the records of the court, and thereby seek by questionable and unfair means to destroy the respect which is and should be entertained for the court as the highest judicial tribunal in the state, it would not be long until all respect for it would, and probably should, be lost. There is a well-recognized duty imposed upon the judge or judges to see that the respect and integrity of the courts are maintained, and, unpleasant as it may be, we cannot evade or flinch from the discharge of that duty. It affords a pleasure to be able to state that the members of the bar of the state have as a general, if not a universal, rule shown their appreciation of the obligation resting upon them, both by the statute and by the ethics of their calling, to "maintain the respect due to the courts of justice and to judicial officers" and to "abstain from all offensive practices," this being the first case for many years where

these obligations have been ignored. We hope it may long be the last.

We deem it not improper to say that there is not, and has not been, any feeling of personal animosity or unfriendliness entertained toward respondent by any member of the court. This was demonstrated from the beginning. Every opportunity was given for a retraction of the language used and the charges made. In the written answer filed by respondent everything of that character was most carefully and sedulously avoided. It was then hoped that in the oral presentation of his defense, by respondent himself, something of the kind would be presented. In this we were painfully disappointed. Even after the judgment was rendered respondent and his counsel were informed in open court that it was not the purpose or design of the court to hold him out of court, and that the door was at all times open for the retraction, but this suggestion was spurned, and by two motions filed the procedure was attacked, and the information given that if the court would first recede and vacate the order of indefinite suspension, thus admitting itself to be in the wrong, a sufficient retraction would be made. It must be sufficient to say that the court will not recede from its position, nor vacate its order, unless or until respondent so requests by pursuing the course which he should have adopted in the first instance upon the citation being served upon him.

The motions to vacate the order are

OVERRULED.

DEAN, J., dissenting.

The language reflecting on Judge ROSE that was used by respondent in his brief ought not to pass unnoticed; but, in view of the statute relating to contempt, respondent's motion, which is in effect an application for rehearing, should be treated as such, and on rehearing the case should be dealt with in pursuance of the statutory provisions. The thought expressed in the following language

by the learned chief justice is conceded: "The history of this court, as shown by the many rehearings granted, and arguments permitted and called for on motions for rehearing, is a demonstration of its entire and patient willingness to rightly apply the rules of law and promote its just administration. And it may be truthfully said that none are more willing to grant the fullest opportunities than the judge who wrote the opinion and who has been thus unjustly personally assailed. There is no possible disposition to question the right of any and every person to criticise the actions of the court or its judges."

In support of his contention, respondent filed a brief with his motions, citing numerous authorities, and also calling attention to sections 669, 670 and 671 of the code, which read as follows: "Section 669. Every court of record shall have the power to punish by fine and imprisonment, or by either, as for criminal contempt, persons guilty of any of the following acts: *First*. Disorderly, contemptuous, or insolent behavior towards the court, or any of its officers, in its presence. *Second*. Any breach of the peace, noise, or other disturbance tending to interrupt its proceedings. *Third*. Wilful disobedience of, or resistance wilfully offered to any lawful process or order of said court. *Fourth*. Any wilful attempt to obstruct the proceedings, or hinder the due administration of justice in any suit, proceedings, or process pending before the courts. *Fifth*. The contumacious and unlawful refusal of any person to be sworn or affirmed as a witness, and when sworn or affirmed, the refusal to answer any legal and proper interrogatory.

"Section 670. Contempts committed in the presence of the court may be punished summarily; in other cases, the party, upon being brought before the court, shall be notified of the accusation against him, and have a reasonable time to make his defense.

"Section 671. Persons punished for contempt under the preceding provisions shall nevertheless be liable to indictment, if such contempt shall amount to an indict-

able offense; but the court before which the conviction shall be had, may in determining the punishment, take into consideration the punishment before inflicted in mitigation of the sentence."

It will be observed the language of section 669 is all embracing as to the persons to be affected by its provisions. No exceptions are noted therein. Respondent doubtless relied on the statute, and when cited to appear and show cause why he "should not be dealt with for contempt," finding no exceptions in the statute, was justified in assuming that at the hearing he would be dealt with in the manner provided by the terms of the law regulating procedure in contempt. The statute in question for the most part regulates merely the mode of procedure. It does not define the offense, but leaves that to the court's discretion. Following are a few authorities holding to the legislative right to impose reasonable regulations in the exercise by the court of the power to punish for contempt. *Wyatt v. People,* 17 Colo. 252: "For though the legislature cannot take away from courts created by the constitution the power to punish contempts, reasonable regulations by that body touching the exercise of this power will be regarded as binding." 7 Am. & Eng. Ency. Law (2d ed.) 33: "When * * * the court is a creature of the constitution, the better opinion seems to be that it cannot, by legislative enactment, be shorn of its inherent right to punish for contempts; nor can the legislature abridge that right, although it may regulate its exercise." 9 Cyc. 26: "Independent of authority granted by statute, courts of record of superior jurisdiction, whether civil or criminal, possess inherent power to punish for contempt of court. Such power is essential to the due administration of justice, and the legislature cannot take it away or abridge it, although it may regulate its use. Statutes conferring the power are simply declaratory of the common law."

The following general rules are announced in this jurisdiction with respect to proceedings in contempt, showing

that the punishment for this offense has always been treated by us, so far as the reported cases disclose, as a statutory proceeding. It is true the respondents in the cases cited from our own state were not members of the bar, a distinction that, in view of the general language of the statute on contempt, is not believed to be controlling. *Herdman v. State,* 54 Neb. 626: "A proceeding against a party for contempt is in the nature of a prosecution for a crime, and the rules of strict construction applicable in criminal proceedings are governable therein." *Hydock v. State,* 59 Neb. 296: "Proceedings in contempt are in their nature criminal, the rules of strict construction applicable to criminal prosecutions obtain therein, and presumptions and intendments will not be indulged to sustain a conviction for contempt of court." To the same substantial effect are the following. *Vanzandt v. Argentine Mining Co.,* 2 McCr. (U. S. C. C.) 642: "Proceedings in contempt are in their nature criminal, and the strict rules of construction applicable to criminal proceedings are to govern therein." *Haight v. Lucia,* 36 Wis. 355: "A proceeding to punish for contempt is a special proceeding, *criminal* in its character, in which the state is the real plaintiff or prosecutor." *Ex parte Secombe,* 19 How. (U. S.) 9, cited in the main opinion: From an examination of that case it appears a Minnesota territorial statute authorized the court to dismiss an attorney from practice if he did not maintain the respect due to courts of justice, and the order of the court dismissing the respondent from practice for contempt was there held by the United States supreme court to be a judicial act performed in the exercise of a judicial discretion vested by a territorial statute in the Minnesota court. In the state cases cited in the majority opinion from sister states where a suspension of an attorney for contempt is either approved or affirmed on appeal, so far as can be discovered from the citations, the state jurisdictions where the practice prevails, for the most part, either have a statute directly authorizing such removal from practice for contempt, as in *In re Breen,* 30

Nev. 164, or there is no disclosure in the citation indicating either the presence or the absence of a statute on the subject, as in *In re Pryor*, 18 Kan. 72, where Judge Brewer wrote the opinion affirming the judgment of the lower court in a proceeding where the respondent Pryor had been fined $50 for contempt and was suspended from practice until the fine should be paid. *In re Woolley*, 11 Bush. (Ky.) 95, cited in the majority opinion, is a case where the respondent Woolley was charged with contempt under the provisions of article 27, ch. 29, Gen. St. of Kentucky, relating to that subject, but wherein the punishment is limited by section 1, which reads: "A court shall not, for contempt, impose upon the offender a fine exceeding thirty dollars, or imprison him exceeding thirty hours, without the intervention of a jury." The respondent there was not suspended from practice, but was fined $30 in pursuance of the maximum fine permitted by the statute. On the question of the right of that court to suspend an attorney from practice for contemptuous behavior, the court in closing said: "It remains an open question in this state, and we intend in this case to so leave it."

It may well be doubted if the framers of our fundamental law intended to clothe the judiciary with the power to deprive an attorney of his means of livelihood, where he has been adjudged in contempt, by suspending him from the practice of his profession, which is everywhere recognized as a valuable property right. Doubtless this thought was in the legislative mind when the contempt statute in question was adopted. It is contrary to the genius and the spirit of free institutions that any man or body of men in any capacity should try his or their own cause and render judgment therein. It is no sufficient answer to say that a contempt proceeding is the concern of the court, and not of the individuals composing that body. Disguised as it may be, the personal element everywhere remains and everywhere predominates in human affairs. Courts are everywhere sufficiently assertive of judicial prerogative where the statute fails to prescribe rules

of practice. Where reasonable regulations with respect to questions of court procedure are prescribed by the legislature, it would seem they should be acquiesced in until repealed.

The majority opinion holds: "So far as this court is concerned, we are not without a precedent for our guidance in a case almost identical with this. Owing to the high standing of the attorney involved, we will omit his name, but refer to the court journal 'C' of this court, at page 19, where the record may be found." The precedent referred to, it will be observed, as stated in the majority opinion, is not reported, and does not appear in the state reports, and for that reason loses much of its value as a precedent and guide to the bar in the application of the principles involved. For some reason, it seems to have been placed among the archives of the state, where it has long reposed without index or probability of discovery by the practitioner who may be so unfortunate as to offend against the rules of ethics which apply to the practice of his profession. The cited precedent in one respect is not unlike that law of the ancient state which was suspended at so great an elevation over the heads of the people that they could not for that reason read it, and so, without knowing its provisions, were punished for disobeying its precepts.

Admission to the bar is made to depend, not upon the will of the court, but upon compliance with statutory requirements. For cause the legislature may by law provide for the suspension or taking away of that which has been thus bestowed, or it may regulate the punishment for dereliction in one or more phases of professional duty. With respect to contempts, the legislature has exercised its prerogative in the adoption of the contempt statute, and it would seem to be the better rule that its action as to procedure in contempt should be exclusive and controlling. Suspension and disbarment proceedings are controlled by the provisions of chapter 7, Comp. St. 1909. The inherent right of a superior court created by the constitu-

tion to punish for actual or constructive contempts is conceded; but, in view of the authorities, I doubt the right of the court to so punish except in pursuance of such regulative provisions as the legislature may have seen fit to impose upon the court in the exercise of this tremen-. dous power. The court may punish for contempt, but the better rule seems to be that the lawmaking body has the right to exercise its function in the imposition of a law to regulate the punishment. This our legislature has done in the adoption of the statute in question, and in my judgment it is binding upon us. If the effect merely of the law is bad, relief should be sought at the hands of the legislature. We should not be asked to ignore it.